966 F.2d 148
 60 USLW 2769, 22 Envtl. L. Rep. 20,927
 MEDICAL WASTE ASSOCIATES LIMITED PARTNERSHIP, a Maryland
Limited Partnership, Plaintiff-Appellant,
v.
MAYOR AND CITY COUNCIL OF BALTIMORE, Defendant-Appellee.
MEDICAL WASTE ASSOCIATES LIMITED PARTNERSHIP, a Maryland
Limited Partnership, Plaintiff-Appellant,
v.
MAYOR AND CITY COUNCIL OF BALTIMORE, Defendant-Appellee.
 Nos. 91-1801, 91-1820.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1992.
Decided May 28, 1992.
As Amended July 17, 1992.
 
 Justin James King, Asst. Sol., Baltimore, Md., argued (Neal M. Janey, City Sol., Ambrose T. Hartman, Deputy City Sol., Frank C. Derr, Principal Counsel, on brief), for defendant-appellee.
 Before WIDENER, Circuit Judge, CHAPMAN, Senior Circuit Judge, and MacKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 MacKENZIE, Senior District Judge:
 This is an appeal from an Order of the district court granting appellee's Motion for Summary Judgment and denying appellant's Motion for Summary Judgment.
 BACKGROUND
 In 1988, appellant, Medical Waste Associates Limited Partnership ("Medical Waste"), initiated a plan to build a medical waste incinerator in the Baltimore area. As required by the city code, Medical Waste sought and received on June 26, 1989, from the Mayor and City Council of Baltimore a zoning approval for the conditional use for building and operating an incinerator in the city. This zoning ordinance, Ordinance 323, provides in part:
 SECTION 1. BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF BALTIMORE, that permission is hereby granted to Medical Waste Associates, a Maryland Limited Partnership, for the construction and operation of an incinerator for the disposal of special medical waste, ... and subject to final licensure by the State Department of the Environment.
 Sec. 2. AND BE IT FURTHER ORDAINED, that use of the incinerator will be restricted to facilities located within the following political subdivisions participating in the Northeast Maryland Waste Disposal Authority: Baltimore City, Baltimore County, Anne Arundel County, and Harford County.
 Also included in the ordinance are several paragraphs explaining that the ordinance was being passed so that the city's system of medical waste disposal would comply with emergency regulations of the Maryland Department of Health and Mental Hygiene and the Maryland Department of the Environment.
 Medical Waste now argues that section 2 of the ordinance violates the Commerce Clause of the United States Constitution. A dispute over the geographical restrictions in section 2 arose when Medical Waste contended that it had to import waste from areas not allowed by the section in order for it to adequately test its 150 ton incinerator.[1] Medical Waste first raised this issue in a letter from its president, William Boucher, III, to the Mayor of Baltimore, dated April 24, 1990. In the letter, Mr. Boucher reported that the construction program was over "fifty percent complete" and argued that while Ordinance 323 would limit the source of waste once the facility was in operation, this limitation ought not apply during the testing phase.[2] Indeed, Mr. Boucher assured the Mayor in his final sentence: "Obviously, when we are in use we will be limited as anticipated by all relevant regulations."
 The Mayor responded in a letter dated April 30, 1990, that he "do[es] not and will not support any proposal that would allow non-Baltimore area medical waste to be disposed of at the [Medical Waste] facility." The Mayor also explicitly raised the question of whether the facility needed this outside waste for a successful test. In a short, direct response to this question, Mr. Boucher replied on May 3, 1990:
 The community leaders of Brooklyn are not right regarding the claim that the facility needs waste from outside the Baltimore area. We will be successful when we operate. Our problem is only in pre-operating testing.
 After this initial volley, the issue apparently did not come to the forefront again until late April of 1991[3] when Medical Waste formally applied for its Final Use and Occupancy Permit. It was not until then, after completion of the facility and almost two years after the passage of Ordinance 323, that Medical Waste first contested the constitutionality of section 2. See Complaint for Declaratory Relief at 6 (Joint Appendix at 18). In other words, as late as February of 1991, Medical Waste expressed itself as completely in accord with the ordinance, but once the facility was complete and ready to become operational, Medical Waste wanted the section 2 limitations declared unconstitutional. Because of this refusal to abide by section 2, the City, on May 29, 1991, formally denied Medical Waste's application for a Final Use and Occupancy Permit. In early June, Medical Waste brought the Declaratory Judgment action currently before the Court.
 STANDARD OF REVIEW
 An appellate court reviews a grant of summary judgment de novo, applying the same standard as that applied by the district court. See Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127 (4th Cir.1987). The applicable standard is that "summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law." Miller v. Leathers, 913 F.2d 1085 (4th Cir.1990) (en banc), cert. denied, --- U.S. ----, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). As stated earlier, because the district court found that Ordinance 323 did not violate the Commerce Clause, the court granted appellee's Motion for Summary Judgment, and denied appellant's same motion. See Medical Waste Assoc. Ltd. Partnership v. Mayor of Baltimore, Civ. No. S 91-1547 (D.Md. Aug. 29, 1991). It is from this decision that Medical Waste has appealed.
 Commerce Clause
 The Commerce Clause limits the extent to which states may seal off their borders from the flow of interstate commerce. Indeed, the Supreme Court in City of Philadelphia v. State of New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978), held that a state may not close off its boundaries to an article of commerce regardless of the nature of that commerce. In that case, the Court struck down a New Jersey statute which prevented all out-of-state trash from being accepted by landfills within the State of New Jersey. In so doing, the Court set out a two tier test for analyzing statutes which impact interstate commerce:
 The opinions of the Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtual per se rule of invalidity has been erected (citation omitted). The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders (citations omitted). But, where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).
 City of Philadelphia v. State of New Jersey, 437 U.S. 617, 623-24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).
 In Pike the Court set out a less restrictive test commonly referred to as the Pike balancing test. Under that test, "[w]here [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefit." Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (citation omitted.) Therefore, when a statute does not fall within the per se rule of City of Philadelphia, the Pike test will apply to determine whether the statute passes muster under the Commerce Clause.
 We believe that the per se rule of City of Philadelphia does not apply to the case at bar for several reasons. First, and most importantly, Ordinance 323 on its face does not discriminate against out-of-state waste being brought into the City of Baltimore. Unlike the statute in City of Philadelphia, which banned all out-of-state trash from entering the entire State of New Jersey, the statute in question here bans medical waste from only one facility within a city. We believe that to fall within the purview of the per se rule enunciated in City of Philadelphia, a statute must, either on its face or in its practical effect, discriminate against waste entering a political subdivision such as a city, county or state. Merely excluding out-of-state waste from one facility within a region will not result in a per se violation unless the exclusion has the practical effect of restricting waste from entering the political subdivision involved.
 Second, under the "market participant" exception, as enunciated in Hughes v. Alexander Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), and Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), the City of Baltimore could have built and operated the medical waste facility itself and reserved the entire capacity of the facility for its residents. We believe that by adopting a rule incorporating a "single facility" exception to the per se rule of City of Philadelphia, we reconcile the "market participant" rule with the practical way that cities and counties solve regional waste problems. Specifically, by adopting a rule which allows a city to restrict a single facility's use to its residents, we allow a city to use private capital to solve a regional problem which might otherwise be too costly as a credit impairment for the city to undertake on its own. Indeed, forcing a city to choose between building a waste facility itself, or allowing waste from outside the region to overwhelm a privately built facility, could result in regional waste problems remaining unsolved.
 The Ninth Circuit, confronted with a situation almost parallel to this case, also concluded that the per se rule did not apply when the restriction against out-of-state waste involved a single facility. See Evergreen Waste Systems, Inc. v. Metropolitan Serv. Dist, 820 F.2d 1482 (9th Cir.1987). In Evergreen, the Metropolitan Service District, a municipal entity which operated a single landfill, adopted an ordinance barring from that landfill waste from outside its three county district. Id. at 1483. In upholding the ordinance, the Evergreen court reached the Pike balancing test because:
 Unlike New Jersey's total ban on out-of-state waste, Metro's ordinance applies to only one of Oregon's many landfills and bars waste from most Oregon counties as well as out-of-state waste. [The ban] therefore does not fit the Court's paradigm of a per se violation: "a law that overtly blocks the flow of interstate commerce at a State's borders."
 Id. at 1484; see also BFI Medical Waste Sys., Inc. v. Whatcom County, 756 F.Supp. 480, 484 (W.D.Wash.1991) (following City of Philadelphia instead of Evergreen because ordinance was not limited to a single facility).
 In conclusion, we agree with the district court that the case before us is "remarkably similar" to Evergreen and agree with that court that a "single facility" exception to the broad per se rule of City of Philadelphia is appropriate. Having found that the statute is not a per se violation of the Commerce Clause, we now analyze Ordinance 323 under the Pike balancing test. Accordingly, we turn to whether the ordinance (1) effectuates a legitimate local public interest, (2) has only an incidental effect on interstate commerce, and (3) does not impose a burden on commerce that is clearly excessive in relation to the putative local benefits. See Pike, 397 U.S. at 142, 90 S.Ct. at 847. Without pause, we agree with the district court that the ordinance satisfies these criteria and, therefore, is constitutional.
 Certainly, the purpose of the ordinance, which was to meet emergency regulations and to prevent medical waste from polluting Chesapeake Bay and the landfills of Baltimore, "effectuates a legitimate local public interest." Creating a regional facility limited to a specific geographical area ensures that all of the waste from that area will be properly disposed of.[4] Any burden on interstate commerce that might exist, of which plaintiff has offered no evidence, is only of an incidental nature and is not "clearly excessive" in light of the proper disposal of a whole region's infectious and noninfectious medical waste. Moreover, as previously noted, Ordinance 323 involves only one facility in one city in Maryland. If demand so requires, Ordinance 323 does not prohibit another incinerator from being built nor preclude the City Council from allowing a second facility in Baltimore to expand.[5] This Court concludes that Ordinance 323 satisfies the Pike balancing test and, that the ordinance is constitutional.
 Constitutional Estoppel
 Probably unnecessary for decision since we conclude that Ordinance 323 does not violate the Commerce Clause, we are nevertheless troubled by Medical Waste's conduct during negotiations with the City of Baltimore following the passage of the ordinance. The United States Supreme Court in various contexts has repeatedly held that "[i]t is an elementary rule of constitutional law that one may not 'retain the benefits of the Act while attacking the constitutionality of one of its important conditions.' " Fahey v. Mallonee, 332 U.S. 245, 255, 67 S.Ct. 1552, 1557, 91 L.Ed. 2030 (1947) (citing United States v. City & County of San Francisco, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940)); see also Arnett v. Kennedy, 416 U.S. 134, 152-53, 94 S.Ct. 1633, 1643-44, 40 L.Ed.2d 15 (1974). The ideas expressed in the Fahey and Arnett opinions cast considerable doubt on appellant's challenge to Ordinance 323.
 First, in Fahey v. Mallonee, the Supreme Court found that shareholders of a savings and loan association created under an act of Congress were estopped from challenging in a derivative action the very Act under which it was created. Fahey, 332 U.S. at 255-56, 67 S.Ct. at 1557. The Court wrote: "It would be difficult to imagine a more appropriate situation in which to apply the doctrine that one who utilizes an Act to gain advantages of corporate existence is estopped from questioning the validity of its vital conditions." Id. at 256, 67 S.Ct. at 1557. More recently, the Court addressed a challenge that the procedures for removal of nonprobationary federal employees under the Lloyd-La Follette Act were unconstitutional. See Arnett v. Kennedy, supra. Justice Rehnquist, writing for a plurality, stated:
 We believe at the very least [constitutional estoppel] gives added weight to our conclusion that where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet.
 Arnett, 416 U.S. at 154, 94 S.Ct. at 1644. Justice Rehnquist went on to express his concern that the Court would be interfering with a legislative compromise [emphasis added] with the result that the Court would be "holding that federal employees had been granted ... not merely that which Congress had given them in the first part of a sentence, but that which Congress had expressly withheld from them in the latter part of the same sentence." Id.
 Like the bank in Fahey, this medical waste incinerator would not exist in Baltimore today if it were not for the passage of Ordinance 323 which Medical Waste very actively pursued. Furthermore, the record indicates that the passage of Ordinance 323, which allowed the construction of the incinerator, was a politically explosive issue. Section 2 was the compromise that allowed the ordinance to pass. Certainly, the affidavits of four members of City Council would indicate this to be so.[6] Consequently, like Justice Rehnquist in Arnett, this Court is inclined to find that Medical Waste must "take the bitter with the sweet."
 
 
 1
 That Medical Waste was under no pressure to enter the project supports this position. Medical Waste knew of and completely acquiesced to the limitations imposed by section 2 before construction of the incinerator ever began. As the correspondence between the parties shows, for two and one-half years after the passage of Ordinance 323, Medical Waste assured the City Council and Mayor of Baltimore that it would comply with the geographical limitations. Not until very late in the process, after the incinerator was ready to become operational, did Medical Waste raise the specter of a constitutional violation.
 
 
 2
 Medical Waste argues that cases such as Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), demonstrate that a party may accept the benefit of certain programs without losing the right to challenge their constitutionality. A case the appellants failed to raise, but which clearly presents their argument, is Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988). The Kadrmas Court addressed a scenario where a student challenged a North Dakota statute which permitted some school districts to charge a user fee for bus service. Before challenging the statute on constitutional grounds, the student partially paid the fee and regularly took the bus to school. The defendants argued that this acceptance of the benefit of bus service estopped the student from challenging the statute's constitutionality. Id. at 456, 108 S.Ct. at 2486. Rejecting this argument, the Court distinguished the Fahey decision because the students did not owe their existence to a statute. Id. The Court continued, "and we doubt that plaintiffs are generally forbidden to challenge a statute simply because they are deriving some benefit from it." Id. at 456-57, 108 S.Ct. at 2486. Nevertheless, by distinguishing Fahey the Court indicated that the doctrine of estoppel still applied where a plaintiff wasn't gaining simply any benefit from the statute, but instead owed its very existence to the statute, which is the case here. This Court refuses to interpret one sentence as destroying a constitutional doctrine that the Court at one time referred to as "an elementary rule of constitutional law." Fahey, 332 U.S. at 255, 67 S.Ct. at 1557. In this case Medical Waste is a commercial entity that made a business decision to build an incinerator. We do not have before us individuals that blindly benefitted from statutes of questionable constitutionality as are involved in the cases appellant raises. At the least, and at the outset, the doctrine of constitutional estoppel makes this Court skeptical of appellant's claim.
 
 CONCLUSION
 
 3
 Because we conclude that Ordinance 323 does not violate the Commerce Clause, we affirm the district court's grant of summary judgment in favor of Appellee and its denial of the summary judgment to the Appellant.
 
 
 4
 AFFIRMED.
 
 
 
 [1]
 To obtain a final operating permit, the Medical Waste incinerator must test at full capacity, which would be at 150 tons
 
 
 [2]
 Mr. Boucher supported this argument with a legal memorandum from Neil Ruther, counsel for Medical Waste. At no point in the seven page memorandum did counsel argue that section 2 was unconstitutional. See Joint Appendix at 52-59
 
 
 [3]
 The record contains a letter dated February 6, 1991, from Consumat Systems, Inc., the company apparently responsible for the testing of the facility, to the Maryland Department of the Environment. The letter reiterates the position that outside waste was needed for testing only and that once the facility was operational, the acceptance of this outside waste would cease. See Joint Appendix at 65
 
 
 [4]
 Appellant vehemently asserted at oral argument that it has contractually agreed to satisfy in full the demands for disposal of medical waste in the area and, therefore, there is no need to limit the source of waste for the incinerator. Nevertheless, contracts can be breached and new hospitals or medical facilities can be built. Thus it is quite proper for the city to want to guarantee the full capacity of the incinerator for regional use
 
 
 [5]
 Although appellant argues that the city's refusal to allow a second facility to expand indicates a closing off of interstate commerce, correspondence in the record indicates that it was Medical Waste which opposed the allowing of individual hospitals to renovate their on-site incinerators. See Joint Appendix at 49
 
 
 [6]
 See Joint Appendix at 85-97 (stating that without section 2 they would not have voted for Ordinance 323). The final vote on the ordinance was 10 for and 7 against with 2 absent. See id. at 76